Good morning, Your Honors. May it please the Court, it's an honor to be here. Let me start with the factual findings by Judge Morris at the District Court. He got it right. He determined, based on overwhelming evidence, that Farmhouse breached the Limited Partnership Agreement by assigning all of Farmhouse's interest in the option and the entirety of control over the option process to Ms. Burroughs. And in at least four places in the Partnership Agreement, it expressly prohibits an assignment of any of the general partners' interests. Well, but I'm not sure the general partners' interest itself is actually assigned, but that's not really the issue we're focused on, is it? If you were happy with that part of the District Court's decision, but you didn't stop there, so maybe we need to focus on the part that you're not happy with. You got a deal. I will do that. I'll say this very quickly, which is the evidence, because you did comment that maybe he got that wrong, but the evidence that Farmhouse's interest was in fact transferred was overwhelming. We had Dabney himself on the stand, Dabney the sole owner of the Dabney Company and the 90% owner of Farmhouse, and the only person who ever acted on their behalf admit on cross-examination, not on direct, not in their briefing, on cross admit that he assigned all of Farmhouse's rights and control to Ms. Burroughs. So he himself admitted that. He assigned Farmhouse to her, but I look at the agreement and I don't want to get too far off the track here. I didn't see anything in the agreement that provides a control provision. I've seen lots of partnership agreements where control of the partnership or the key person, in this case Mr. Dabney, I didn't see anything there that said that Dabney couldn't relinquish his interest in Farmhouse. Your Honor, 5.2 H3 specifically says that all that can be transferred is 49% of a general partner, very clearly saying control, which is 50 plus percent, cannot be transferred. So it's in 5.2 H. Of what? Of the general partner. Of the general partner or the general partnership? The general partner. That one is very specific to the general partner. And Your Honor, this is important because their entire reply brief says it was just a personal interest. But that ignores the partnership agreement. The partnership agreement 8.1 gives the option rights to Farmhouse, not to Dabney, not to the Dabney company. So Mr. Dabney can't transfer his personal rights to the option. He doesn't have any. The only person that holds, the only entity that holds those rights is Farmhouse. Let me jump in here if I may. Sure. My question is, if we can assume for a moment that that occurred, that it was a default under the agreement. Yes. We won't get in for the minute how the district court said, well, it wasn't a material default. But for the moment, he recognized it was a default. The agreement talks about events of default and they're negative covenants. Had the decision been made to exercise those rights, you could have been removed. You could have been maybe have a return of some money and so on and so on. That didn't happen. Those are pretty serious rights. Did Judge Morris get that correct? I mean, how could it a negative covenant that could yield those types of remedies? How could that not be material? That's where he went wrong. Okay. And that's so we're not here saying redo his factual findings. He found that there was an assignment because the evidence was overwhelming. What he found was that it wasn't material. And when you put in four different places in the partnership agreement, you can't assign it. Of course it was material to the parties. And I'll explain why. But of course it was material. And what he also did is when he looked at this question of materiality, he focused on, well, we're terminating the limited partnership agreement. That's not what 8.1 says. 8.1 says if there's a breach, there is no option. So 8.1 doesn't say if there's a breach, you terminate the partnership agreement. It says if there's a breach, you, the general partner, get no option rights. Separately, as you're alluding to, Your Honor, there's covenants that say if you if you breach these various things, including assignments, we can remove you. And the limited partner didn't do that. But there's a reason. 14.1 sets very different standards for removal. The parties were thoughtful. If you're gonna remove a general partner from a partnership like this, you must have a material breach to remove. And it goes on beyond that. It actually says you must have material detriment. So if we were to have tried to remove them, we would have had to go in and prove much higher standards. The parties agreed. Two very sophisticated parties said to remove from the entire partnership, standards are high. But if you want an option right, the standard is very simple. You can't be in breach. Why? Why? Because the option process is complicated. This this idea that, oh, you just hire an appraiser and they'll go set value. Everything that happened in this case shows that that is so far from the truth. You have to hire an appraiser. You have to agree on documents to give the appraiser. You have disclosures about conflicts. What relationships do they have? You have to decide how are they going to value the property? You have the two original people to that contract, Mr. Dabney for farmhouse and the limited partner who agree that the way you set value is you get a broker's opinion of value or an appraisal that shows you what the project's worth and you put it through the waterfall. But and let's get to that, right? It doesn't say it that clearly, right? But both of the original parties to the agreement, that's how they've always done it on every other project but this one. So what experience did these two parties have at the time this agreement was entered into? They had two other projects that they own together, Baxter and Comstock. On both those projects, they did exactly what I'm saying. And when did they do that? They did it after the litigation was filed. After the new boroughs hired experts to say no, there's a new methodology. But they didn't do it before the limited partnership agreement was entered into. So there's not a course of dealing that your client can cite that it relied upon, can it? Absolutely, Your Honor. What course of dealing did it rely upon when it entered the limited partnership agreement? I'll correct myself. When they signed it, there the two parties testified at trial, right? Mr. Sussman, who's here in the back, testified as to his intent. Always sale methodology. The other person to that agreement, Mr. Dabney for Farmhouse, said that he had never even heard of this new methodology that the attorneys for boroughs came up with. Never heard of it. So the two people to the contract admitted that they never intended this new weird approach. With respect, counsel, I know a lot has been made about Mr. Dabney being a smart, capable person, but the reality is this was not a personal services contract. If he had died, for example, God forbid, they would have lost him. Any other number of things could happen. So there was nothing in the contract that said they had to deal with Mr. Dabney, right? Correct. Okay, so if we're tracing everything back to what Dabney would have done, I'm not sure how far that goes. And it seems like you're, as my partner, my colleague points out here, the reality is there was no course of dealing. You're just flying blind as to how this should be valued. And I can see where parties disagree about that. But how does the partnership agreement resolve the issue of how the valuation should occur? You're saying that the option not to exist at all, right? No, no. So great questions, and let me direct, answer them directly. Okay. The you can't assign it to somebody without our approval. Why? Because all of these things we're talking about, the partner, the 8.1 doesn't say you use a sale methodology. What if Mr. Dabney had died? The question that Judge Smith just asked. Then the parties would have to figure out who would take over, but they'd have to agree. The limited partner has to agree, Your Honor. And here's the thing. Mr. Dabney didn't die, right? And this, these projects typically after 15 years, they do get sold. Every other project with Mr. Dabney, every one was sold because he wanted to retire. In the divorce agreement, he gave up the right to sell. That is a material change. Well, with respect, um, what I'm struggling with primarily is the fact that your folks agreed that you got everything out of the partnership in terms of tax benefits and the like that you bargained for. There was nothing missing. The partnership agreement simply doesn't talk about the methodology for valuation, sale, any of those things. It really gets down to does the option still exist? I know that's important for you, but but the district judge seemed to be relying primarily on Montana case law and I think Montana Limited Partnership Act to come to the you missed there? I mean, there's no terms of materiality in the in the agreement that fits here, but that certainly seems to be the, if you will, the essence of what the Montana case and statutory law says. What am I missing? So I would disagree that last comment. That's not what the law says. So let's talk about it. He got the facts right. This court reviews application of law de novo contracts when you're applying a lot of fact, de novo. Okay, so here he got two things wrong. He said materiality was required. So under Montana law, okay, the courts distinguish Davidson versus Barstow. The courts say if there is a condition precedent to the creation of the option, the contract, then you don't impose materiality. You enforce the condition precedent here. If you look at Section 8.1, it says if the general partner or any affiliate is not then in default under the terms of this agreement, the general partner shall have an option. It's a unequivocal condition precedent to the creation of the option. Now, these questions of factor of law that it was a bench trial, right? The judge decided as a matter of fact that it was assigned and that it was a breach of the contract. So that that's a question of fact, that's a question of fact decided. Then you apply the law to it. This contract says only if you're not in default, do you get an option? That's a condition precedent. Here's what the Davidson versus Barstow court said to your question, Your Honor. Montana law. It says the failure of a non satisfaction of a condition precedent to the contract formation renders the contemplated contract non existence, non existent as never formed and that's non binding and unenforceable. But that's not actually what you're arguing here. It is absolutely what I'm arguing. Well, you're arguing that the contract is enforceable on your terms. That is, you can deny the option which would exit your client from the partnership and leave it in a partnership with the party. It says it doesn't trust anymore and doesn't want to be in a partnership with your client. At the same time that the district court's factual finding unchallenged, cited previously by Judge Smith, that your client got everything that was entitled to up to that point. I'm lost here. Okay. Because at this point, they exercise the option. Your client is out. Your client has no continuing interest in the partnership. Shouldn't matter to your client who's leading this partnership. Where's your client's interest been impaired in any fashion? $3.5 million, Your Honor. So, yes, our client got tax benefits, but this contract has lots of pieces. You construct it, you get tax benefits, you get losses. And then after year 15, sometimes for some of these projects, oftentimes there's millions of dollars of equity that's built up. The partnership agreement also says how that equity is divided. 11.2 says on a sale, the limited partner gets its capital back, and then the general partner gets most of it. Except you've got the option sitting there. And the question is, what interest does your client have to deny the option right, which clearly exists? You've cited the difficulty in valuation. I have to tell you, in practice, more than on this Court, because we don't get those kind of cases very often, but in practice, I dealt with lots of valuation issues. Those are pretty routine, and it may be that you didn't like the approach taken by those Ms. Burroughs, but you weren't going to roll over and play dead on that. If the two of you have to fight it out, you could fight it out. But courts accomplish all the time. So I'm having trouble figuring out how your client has been aggrieved in a way that justifies disregarding the option and letting your client continue in a partnership it says it doesn't want to be in a partnership with. Two answers. One is there is no option, right, unless they're not in breach. So I get your question, Your Honor, but it's actually not what two sophisticated parties agreed on in 8.1. The option agreement says there is no option if you're in breach, and it's undisputed. The Court's held that there's a breach. It's undisputed, obviously not undisputed by your colleagues over there, undisputed or as part of the conclusion reached by the District Court, and it's an issue we may ultimately have to deal with because they pushed it forward, but I'm still more interested in the second part. Okay, and materiality. How is it materiality? And that's of concern to me. You've said that, well, the word material doesn't appear here, so any default, no matter how trivial, matters. And I'm not sure I understand Montana law in the same way that you've just argued it. I don't think Montana law reads materiality out, and I don't see how the parties clearly did so in a contract where they use material in some places and use the word default without material in others. Is that all we have to go on? It's not all we have to go on. We have the language of the contract, where the parties used specifically here said it's a condition precedent. We have Davidson versus Barstead, which makes the exact distinction I'm talking about. Condition precedent, you don't use materiality, but if you're now talking about performance, once the option's created, then you look at materiality. So I ask you to look at that. It does make this clear distinction, but let's go to materiality, because you're saying, hey, option processes are easy. Your Honor, I do litigate easy, but I made a living out of it for a while, but they get accomplished. So do I, and here's what I would tell you. This isn't a normal option process. Look at Hobbs. Hobbs was an option. You pay $230,000. It doesn't matter if John or Bill pay it. You get $230,000. So we're not Hobbs. The court in Hobbs specifically found there was no damage from an assignment. What we have here is a process that can be manipulated, is manipulated, and we have the two people who were the original parties to the agreement who have never supported the argument being made by Ms. Burroughs. So you say, what did our clients lose? How are they being damaged? Their chosen partner, which is respected under Montana law. We gave you our sites. Let's go back. That's, I realize you're running out of time, so I'm going to jump ahead. We've just established that there wasn't a course of dealing that gave your client a basis to trust on Mr. Dabney's way of doing things, because they didn't have prior experience with Mr. Dabney. So, so I'm having trouble understanding how this limited partnership agreement encompasses all these understandings. Conduct after the fact, Your Honor. So, yes, they signed the agreement. The two people to that agreement, even after they, Ms. Burroughs develops an attorney memo that says it's supposed to be done this other way. Language that doesn't exist in the contract. You have to wait 36 years for a sale. All value built up in the equity goes to the general partner. None of that exists in 8.1 either. They prepare a memo that says that's how it's done. Discounted cash flow only. Mr. Dabney, who's the sole person for Farmhouse, said that was never the intent. He never even read that, never approved it, and has never used it in any other project. So course of conduct can occur before a contract is signed. It could also occur after. And it speaks after to what should be done here. It does not speak after to what the parties agreed to 15 years before. But the parties agreed that they get to deal with Farmhouse, not Ms. Burroughs. And this personal services concept. They did not agree that they got to deal only with Mr. Dabney because Mr. Dabney could have passed away a long time ago. Okay. So they make that argument. That is a very, there's a lot of creative legal arguments. $4 million only goes to the general partner. We're hearing it from both sides. But this is, this is, but Your Honor, I'd like to say this is a creative legal argument. What are they saying? They're saying, hey, if Ms. Burroughs had actually taken Dabney's interest in the Dabney Company or become the officer of the Dabney Company, then transferring control to her might have been allowed. Even though we have four provisions that specifically say, can't transfer control, can't transfer any interest in the general partner or the partnership, or any allocation or distributions without limited partner approval. But this argument is, well, we could have accomplished the same thing if Ms. Burroughs had just stepped into control of the Dabney Company or Farmhouse. But here's the facts. There's no evidence of that in the record. It never happened. So this concept is a fiction. And so the last point I want to make, Your Honor, excuse me, what is a fiction? The idea that he just assigned personal interest because she just came in and took control of the option process because she took over somehow Dabney's position. But that would mean she became an officer, a director, an employee, or gained some ownership of Farmhouse or the Dabney Company. No evidence of that. All evidence is one thing. Mr. Dabney has always been and remains the sole shareholder of the Dabney Company. I've practiced primarily transactions law for 37 years. And I've got to tell you, what you've got here, you didn't draft well enough. Somebody didn't foresee these things. And so now you're trying to graft onto it what you believe the reasonable parties would have done. But Mr. Dabney could have died. There was no personal services contract here. You didn't know who was going to be there. Oh, maybe he was. Your Honor, 5.2h does actually deal with, you can't transfer control. It deals with it expressly. What if he died? So let me go to this. Answer that question. What if he died? What if he died? If Mr. Dabney dies and they then have to decide who's going to take over the Dabney Company, they have the right to do that. They're transferring control now. If they transfer more than That's what the contract says. Keep saying no? I mean, realistically, the answer to that question is no, that it couldn't. The court would assume, like the law suggests, that a reasonableness standard applies. Ms. Burroughs has never run a light tech project, has never been approved by the governing agencies for low-income housing to run a light tech project. Let me say this. Your time is up. You're a good lawyer. We appreciate your argument. But let's hear from the other side, okay? Can I say one quick thing, Your Honor? Is it a prayer, or what is it? It's not a prayer. It's a third point, which is this can't be remanded to the trial court for Ms. Burroughs to handle the option, because Montana law is very clear on this thing. Anti-assignment provisions are enforced. Ms. Burroughs, that assignment by law cannot be respected by the court. What this judge has said is it now goes back to the court for Ms. Burroughs to deal with it. Okay. By law, that's forbidden. We appreciate your argument. All right. So, I imagine it's gonna be Mr., is it Black or Black? Black. I imagine you disagree with your colleague. Well, on some things. You know, may it please the Court, Mike Black, attorney for Farmhouse. I'm here with Sid Best, who helped me try the case and was instrumental in the briefing. I'm a sole There are three things that I really want to talk about here, and I know that I'll be answering your questions, but, you know, first of all, we need to talk about, you know, what the contract says, whether there was a breach, and whether the breach is material. But I really want to go back to this 5.2 H3 control provision, because it's very clear. You know, we have a very sophisticated party on the other side. This contract is 86 pages long of text. There are a hundred provisions by my count that allow the limited partner to consent to anything. And if you look at 5.2 H3, what they need to do, you need to get the consent of the limited partner for the transfer assignment pledge conveyance of any partnership interest in the partnership or more than a 49% interest of any general partner of the partnership. Let me ask you this, under Montana law, let's assume, arguendo, that Dabney and his wife were just the best. They just were lovey-dovey, and he died. And she inherited everything under Montana law. Where would that have put this case? Would they have had a right to object? I don't think so. Inheriting interest in the property? No, and I don't mean to interrupt, Your Honor. No, not at all. For two reasons. One is, there is no provision here. This provision talks about transfer of control of the general partner. The general partner is Farmhouse Partners Limited Partnership, not the Dabney Company. Mr. Dabney, as we all know, is the sole shareholder of the company that is the general partner of the general partner. And the distinction is extremely important here, because we have a LIHTC project. You have 10 years to get the tax credits. You have 15 years to comply. And if anything goes wrong within those 15 years, the IRS can come back in and disallow those tax credits. And so, if in fact, you know, Mr. Dabney died, this is structured in a way so that they're not going to lose the tax credits. It's structured in a way that whoever his heirs or devisees are at law, whether it be his wife, or maybe she deceased, who knows. But if Mr. Dabney died in 2013, the Dabney Company would have new equity holders, but it would still be the general partner of the general partner. Somebody else might, you know, be elected to be president of the Dabney Company and would exercise management control. Would, under this arrangement, would the limited partner have had a right to as a matter of law to take Dabney's place? Absolutely not. So that wasn't thought of? Well, I don't know if they thought about it or not. They don't have the right under the limited partnership agreement. Right, exactly. They don't have that right. You know, I mean, they thought about a lot of things. Like I said, I counted 100 provisions where the limited partner could withdraw consent to any particular actions. None of them have to do with who is managing the Dabney Company or even who the agents of Farmhouse are. So this thing is structured so, I mean, Mr. Dabney was 54 years old when he executed this contract. The contract has a term of 55 years. The LIHTC compliance period lasted until he was 69, and I assume that their extra three years was for a statute of limitations, so he couldn't even exercise the option until he was in his early 70s. Now, one of the factual assertions made by counsel, which I disagree with, has to do with these other two projects that were liquidated. Both of these liquidations occurred after this contract was entered into. The back... He's acknowledged he doesn't have a course of dealing argument. He does not. That leads up to the limited partnership agreement. That's right. We did have some confusion, but he's acknowledged that. Exactly right. There is no course of dealing. There was no option in Comstock. The option in Baxter was the same option as here, but it didn't ripen for three more years. It would be ripe this month had there not been a decision to strike while the iron was hot, while the real estate market was good in Bozeman, and while interest rates were low. Well, just to finish my earlier point, you point out that Mr. Dabney was 55-ish when the contract was drafted. The contract was supposed to last for 50 years. Odds are he wouldn't live to be 105. So at some point he was gonna die. Exactly. And what if anything did the contract say about that and its impact? Nothing. Nothing. Okay. And that's really important here because we all know that there are no restrictions under the contract for there to be any transfer of equity in the Dabney company, whether it be by devise or sale or anything. There's no restrictions under the contract with how the Dabney company or even Farmhouse raises capital to pay for the option. And the option itself provides that at closing, Farmhouse has the absolute discretion to designate who shall take by assignment. So whether the decision was made, you know, based upon a dissolution agreement where I've got this opportunity in the future, because as Mr. Dabney's role, he traditionally had the opportunity to buy the limited partner interest through Farmhouse. And nothing in that marriage settlement agreement was an immediate transfer of anything having to do with the Bridger One project. Let me ask you this. Mr. Dabney, of course, is alive and well, as far as I know. And when the valuation issue came up, putting aside for a moment whether the transfer was appropriate, did he have anything to say as to the valuation? Was there any kind of a proceeding involved in which the valuation could have been disputed where he could have testified? Well, I don't know that we got to that point. The judge said that, you know, I'm not gonna listen to valuation testimony. What happened was is that after Mr. Dabney retained the counsel who took the case on and filed the lawsuit in September of 2020, they engaged an appraiser, they engaged Mr. Strain, and they looked at it to determine what they thought it would be. And when they exercised the option, which everybody acknowledges was timely, they provided a copy of the appraisal in the opinion letter. I don't think that that's unusual. I mean, these are sophisticated parties. Well, and that may be what helps to land us here, because the argument being made by multi-housing is that the approach used was radically different than the approach that would have been used. Now, you didn't have much testimony about valuation, but it did seem to me as I went through, and I can't put my finger on it now, but it seemed to me that the valuation proposed in that purported exercise of the option was pretty far from the value of the property the district court appeared to recognize without getting deep into valuation. Well, and I'm happy to discuss that, Your Honor, because really what we've got are two different issues here. You look at the Comstock II project, there was no option language. So if we're going to look at selling the project, you know, and selling the property, that was one of the benchmarks that they used in negotiation. That was for Mr. Dabney to obtain the limited partner interest in the Comstock project. He individually got it, Farmhouse remained the general partner, then they decided to dispose of the project. There was no option. So you look at how you're going to value this, you don't have a benchmark, okay? With respect to Baxter, again, the option had already been exercised in this case before there were any negotiations as to what to do with Baxter. You don't have a benchmark on history. But going back to what I'd said before, valuation comes up pretty commonly in dealing with, in this case, a potential exercise option or dissolution or there are lots of events that trigger valuations in court. Is the proposal and the argument that I've heard, and I understand it, is that it matters who you're dealing with, and as a general proposition, that's true, as a law partner, I cared about who my partner was. So if you're in this project, you have an interest in who you're dealing with, and the complaint really is that Ms. Burroughs was a wild card and that's not who they had reason to deal with, and so there wasn't perfect performance of what has been described as a condition precedent for exercise of the option. And the substance of that valuation proposed by the new entrant was something off the table. Now, the district court didn't get into valuation, but did say things to suggest the value was probably higher than that proposal had suggested. So what do we make of all of this? Well, the value of the real estate is separate from the value of the limited partner's interest. We have to understand that the testimony of trial is that this, and it was found by the district court, that the option language in section 8.1 was drafted by the limited partner, which is an affiliate of MHTCP, the current limited partner. It's used in at least 20, maybe 30 of their limited partnership agreements across the country, and they had up to 275 of them. And so the valuation of the limited partner interest, not the property, not the liquidation of the property that would come under the waterfall provision of 11.2b, I believe it is, specifically the definition of fair market value in 8.1c1 provides what the appraiser shall be instructed to do. Now, we can have disagreements ultimately as to what that means, and maybe we will get to that if this court affirms the specific performance part of the judgment. But they're instructed essentially to say, you will assume that you will continue to use this property as a low-income housing tax credit project. And what that means is we've got rents that are 15 to 20 percent below market. It instructs them to go back and look how to determine what the rent is. And so if we're exercising an option where we have essentially 37 more years of this partnership, and you're to instruct the appraiser that you're going to continue to use this, at least the impression of the consultants engaged by a farmhouse. And frankly, Mr. Dabney said he never even thought about it. He's not an appraiser. He's not a lawyer. He didn't spend a lot of time looking at this option. He just knew it was there and thought it was valuable. But the approach that was taken is that you discount the rents to be received and the economic benefits over the next 37 years to present value, and then you figure out what the liquidation result would be in 37 years as far as the value. The problem from the limited partner's economic perspective is when you discount it to present value, it's not going to be as lucrative as if you force a liquidation. You probably understand that better than me. The question I'm trying to get to here is that the argument I've heard from multi-housing, and I can't remember the acronym so I'll just say multi-housing and know who I'm talking about, is that in that context who the person on the other side of the table matters. And I think as a general proposition, at least those of us who've been law partners understand that. And if you've got a valuation process that, I mean the district court ultimately said we don't have, it's not simply a mechanical application of a clearly defined valuation. There's some work ahead that's going to have to be done. Now why is it that multi-housings argument that to engage in that effort they ought to have control over who the other person is? Why isn't that enough to avoid, I want to say material, so strike that. To make this the exercise of a condition precedent for which default is important, and I'm leaving aside the issues where there's been default and we've talked about that before, but if we accept for a proposition the district court has concluded as a matter of law there's been a default and injected materiality into it, I'm posing the Well, it's a long question, Your Honor, and to the extent I understand it, please please clarify me if I'm wrong. I guarantee that you could understand it based on what I just said. Well, well, first of all, the choice of the general partner is Farmhouse. Always has been, always will be. Farmhouse is still the general partner. I recognize what the court has said. Farmhouse has the right to engage any consultants, any lawyers they want. Smart lawyers, dumb lawyers, crazy lawyers, we've dealt with them all the time in our practice over the years, and just because you don't like the lawyer on the other side or they're being difficult doesn't make it a breach, doesn't make it, you know, a failure of a condition precedent to the contract, and while Mr. Dabney may not have analyzed this provision and used it before, because it was only in the Baxter one, it's not that it hasn't happened, and MHTCP, the limited partner, has experience with other appraisers who have taken this very same approach. They don't like it, as I understand it, because they would much rather push towards liquidation of the project and get their equity back, but the contract provides, this is the process we use. If we can't, we're supposed to agree on an appraiser, we get it, we made a proposal as to who the appraiser should be and what the value is, you don't like it, well then propose it an appraiser. Let's work on that part of the process. I guess I should understand you referred previously, maybe it was to just 8.1 as being something that was crafted by the affiliate of multi-housing. Is that true for all of Article 8? Yes, that's what we this provision came from? That's what the court found, and it's consistent across a number of different limited partner agreements. It's multi-housing, whoever the original limited partner was who substituted in in September of 2002, I believe is the general partner of what is now the limited partner now. So I mean, I have to go back and look at the signature blocks, it's actually pretty clear what's going on here, that they're still an affiliate, and I believe Mr. Sussman, who was the entity representative at trial, testified he works for one of those entities. So there's multiple layers here, but this particular provision was drafted by the limited partner, it didn't change from the very beginning it was proposed, the testimony is pretty clear. So from your perspective, you've got a very sophisticated party, they didn't foresee what happened in this particular case. Had they done so, they would have had particular rights, but they got the full benefit of their bargain in terms of all the tax benefits, etc., etc., etc. There was no right to have Mr. Dabney personally involved, you have an entity that could have any other general partner, but he was the general partner of the general partner, he was not directly involved, and if you don't have him, you don't have him. Is that basically your position? Essentially, I don't know if they didn't foresee this result or they changed their mind. It doesn't really matter. When you put together what was said a minute ago, he was 55 when it was drafted, the documents were left to 50 years, he clearly would have died at some point. Somebody should have thought of that, if that was important. Well, that's right, and I think Mr. Dabney did think about it, because that's why he set up an entity to be the general partner of the general partner, because it was important to him as the developer slash general partner to make sure that these tax credits were awarded and they could be properly used, and that's why it's so important to point out that the district court found, and we demonstrated through the evidence, that every benefit that the limited partner was entitled to under this contract has been achieved. The contract was designed to provide their When we talk about materiality, these LIHTC projects, and this is the first case I've ever had, and hopefully the last one, it's a very unique type of circumstance, but the limited partnership is designed simply to attract capital and to have an exit strategy, and the exit strategy happens after year 15 because they get all their economic benefits, and when we look back, you know, and I'm happy to answer more questions, but at this point, I might as well just ask whether either of my colleagues has a question. Yeah, you know, if we look at the public policies that are involved here, I mean, you got the congressional public policy for the LIHTC projects to attract capital for the 15-year compliance period, and then essentially the limited partner or the equity partner exits, and then there's an opportunity to redevelop and get tax credits again. The whole point is to provide low-income housing. This has been very successful. So for the congressional public policy, that has been achieved here, and there's been substantial compliance by the general partner, but the Montana public policy is really important, too. We want certainty in contracts. We want the entity veils and the entities to be respected, and when people get divorced, there has to be a way, if all of their wealth is in these LIHTC projects, to deal with the opportunity that may come up later, and so if you put all those together, all Farmhouse is trying to do is enforce a contract. Okay, very well. Thank you, Your Honor. Now, Mr. Quigley, you've used all your time, but let me ask my colleague, do either of you have additional questions that you want to pose to Mr. Quigley? I think not. I know you are, and we're grateful for it. The case just argued is submitted. I know we could talk about this forever, but we thank you for your arguments and for your briefs. Thank you very much.
judges: Siler, CLIFTON, SMITH